James Greenspan, Esq.
**GOTTLIEB & GREENSPAN LLC**
17-17 Route 208, Suite 250
Fair Lawn, New Jersey 07410
Telephone: 201-644-0891
eFax: 201-465-3033
jgreenspan@gottliebandgreenspan.com
*Attorneys for Petitioners*

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| PLASTIC AND RECONSTRUCTIVE SURGERY GROUP; SHAREEF JANDALI PLASTIC SURGERY LLC; RICHARD AGAG, MD; and THE DIEP GROUP CT PLLC,<br><br>Petitioners,<br><br>AETNA, INC.; ANTHEM, INC.; BLUE CROSS BLUE SHIELD FEDERAL EMPLOYEE PROGRAM; CIGNA HEALTH AND LIFE INSURANCE COMPANY; CONNECTICARE, INC.; UNITED HEALTHCARE; and ABC CORPORATIONS 1-10 (Names Fictitious),<br><br>Respondents. | CIVIL ACTION NO.<br><br>PETITION TO VACATE ARBITRATION AWARDS |

Petitioners Plastic and Reconstructive Surgery Group; Shareef Jandali Plastic Surgery LLC; Richard Agag, MD; and the DIEP Group CT PLLC (collectively, "Petitioners") by and through their undersigned attorney, hereby submit this Petition and would respectfully show the Court as follows:

### INTRODUCTION

1. Petitioners move before this Court for an Order, pursuant to the No Surprises Act, 42 U.S.C. § 300gg-111(a)(3)(E)(i) ("NSA"), and the Federal Arbitration Act, 9 U.S.C. § 10 ("FAA"), vacating the final orders and awards issued by Arbitrator ProPeer Resources, LLC ("ProPeer') beginning on November 13, 2024 through the date of this filing (the "Arbitration

1

Awards"). The Arbitration Awards of $0.00 each were secured through misapplication of law, and in excess of the arbitrator's powers, resulting in an improper decision that did not produce a mutual, final, and definite award upon the subject matter submitted.

2. The NSA, 42 U.S.C. § 300gg-111 et seq, effective January 1, 2022, was enacted to protect patients from "surprise" bills, or balance bills, for services performed by out-of-network ("OON") providers. To facilitate this purpose, Congress created an Independent Dispute Resolution ("IDR") process by which the providers and insurers would either come to an agreement concerning the OON rate or proceed to arbitration according to the IDR regulations. *See*, generally, 45 U.S.C. §149.510.

3. Through arbitration, a Certified IDR Entity ("CIDRE") determines the out-of-network rate for certain "emergency services, certain nonemergency items and services furnished by nonparticipating providers at participating health care facilities, and for air ambulance services furnished by nonparticipating providers of air ambulance services when an All-Payer Model Agreement or specified state law does not apply." *See*, generally, Federal Independent Dispute Resolution (IDR) Process Guidance for Certified IDR Entities ("Federal CIDRE Guidelines").

4. Importantly, CIDREs are expected to make determinations of payments, *not* judgments as to coverage under the terms of the plan.[1]

5. According to federal guidelines, the CIDRE's written decision must include, in relevant part, "what information the [CIDRE] determined demonstrated that the offer selected as the out-of-network rate is the offer that best represents the value of the qualified IDR item or service." *Id* at §7 (emphasis added).

---

[1] *See* Question and Answer No. 45, Frequent Asked Questions Regarding the Federal Independent Resolution Process, https://www.cms.gov/cciio/resources/regulations-and-guidance/downloads/guidance-faqs-federal-independent-dispute-reolution-process.pdf (emphasis added).

6. In each of the arbitrations at issue here, the IDR process was instituted by Petitioners in accordance with the applicable regulations, including attestation to the fact that the items and/or services under dispute were "qualified IDR item(s) or service(s) within the scope of the Federal IDR Process." *Id*. at § 3.

7. Once the parties selected the CIDRE, the CIDRE, in this case ProPeer, was tasked with "determin[ing] whether the Federal IDR Process is applicable." *Id.* at Section 4.4. Included in this initial determination is whether the item or service is considered a "qualified IDR item or service" that is eligible for the IDR process in the first place.

8. ProPeer, as the selected CIDRE in this case, was then tasked with "determin[ing] whether the Federal IDR Process is applicable." *Id.* at §4.4. Included in this initial determination is whether the item or service is considered a "qualified IDR item or service" that is eligible for the IDR process in the first place.

9. 8. Thus, within the regulatory framework, the eligibility determination is bifurcated from the valuation determination and must be made before the CIDRE makes a determination as to the *value* of the item or service.

10. It logically follows, therefore, that the CIDRE cannot agree with an insurance carrier's coverage denial, deeming a service unqualified for the IDR process, while simultaneously allowing the arbitration to proceed to a merit-based determination that the value of that same item or service is, as the insurance carrier offers, $0.00.

11. This conflated approach, however, is the exact methodology repeatedly enacted by ProPeer in relation to **hundreds** of Petitioners' IDR proceedings. ProPeer first determined that the services were eligible for NSA arbitration, allowing the disputes to proceed to a valuation determination. It then ruled in favor of the Respondents' $0.00 final offer valuations of the services.

12. By engaging in the arbitration process, Respondents contemplated that the *value* of the qualified services would be determined. Where Respondents then claimed the value of the services was $0.00, Respondents effectively communicated that the services were *not* actually qualified for value determination under the NSA. ProPeer, in accepting Respondents' valuation rationale, erroneously adopted Respondents' blanket coverage denials and/or statements of ineligibility and issued merit-based decisions that jeopardized Petitioners' legal rights under the NSA and beyond.

13. Not only did ProPeer conflate the eligibility and valuation determinations under the NSA, but it also inexplicably determined that Respondents' $0.00 final offers for some services were appropriate *even* where the Respondents, during initial pre-arbitration claim-processing, remitted payment for those same services, **thus acknowledging that the services had some value**.

14. If ProPeer determined that the medical services at issue were covered benefits and were properly before it for valuation consideration (i.e. were eligible for arbitration), then the selection of a $0.00 insurance carrier final offer would be impossible. It is axiomatic that a medical procedure performed on a patient who is protected from balance bills under the NSA, such that the valuation of said services is properly before a CIDRE, must have value. Therefore, ProPeer improperly executed its powers such that a definite award was not made when it both determined that these services were eligible and also determined that the valuation of such services was $0.00.

15. ProPeer's mishandling of the NSA IDR process results in not only a rejection of the Petitioners' proposed payment amount, but also significant legal consequences for Petitioners. As a result of ProPeer's mistaken application of the law, Petitioners suffered a complete preclusion of any alternative forms of relief, including the abilities to appeal Respondents' coverage determinations and/or balance bill the members. In essence, ProPeer's incomprehensible

mishandling of these claims resulted in Petitioners having rendered their medical services for free. To allow such prejudicial errors to persist would have a chilling impact on the quality and availability of medical services in this nation.

16. Ultimately, if ProPeer determined that the items and/or services submitted for arbitration were ineligible on the basis of denied coverage, as argues by Respondents, ProPeer had but one option: to dismiss the Arbitrations.

17. In issuing $0 Arbitration Awards while agreeing with Respondents' coverage denials for the services at issue, ProPeer exceeded its arbitration powers in violation of 42 U.S.C. § 300gg-111(a)(3)(E)(i) and FAA, 9 U.S.C. § 10(a)(4). For the reasons stated herein, the Arbitration Awards should, therefore, be vacated and remanded for eligibility determinations based on coverage denials followed by payment determinations for "qualified" items or services.

## THE PARTIES

18. Petitioners are corporations offering medical services, who, as nonparticipating providers, as provided by the NSA, 42 USCS § 300gg-111(a)(3), provided out-of-network services to certain of Respondents' members and participated in the NSA's IDR process. The majority of Petitioners have principal places of business in Connecticut. *See* **Appendix A, Table 1.**

19. Respondents are corporations engaging in issuing and/or administering health insurance in Connecticut that participated in the subject IDR Arbitrations facilitated by ProPeer. At all times hereinafter set forth, Respondents were health insurance issuers or group health plans, as defined in the NSA, 42 USCS § 300gg-91(a-b), and within the meaning of the NSA, 42 USCS § 300gg-111-112. Respondents have and continue to conduct business within this district. *See* **Appendix A, Table 2.**

20. ProPeer Resources LLC is a CIDRE operating in Connecticut with headquarters located at 5600 Schertz Parkway, Suite 200 in Schertz, Texas. At all relevant times, ProPeer was the CIDRE which presided over all IDR arbitrations relevant to the claims herein.

## JURISDICTION AND VENUE

21. This Court may properly maintain personal jurisdiction over Respondents because Respondents' contacts with Connecticut and this federal judicial district are sufficient for the exercise of jurisdiction and comply with traditional notions of fair play and substantial justice.

22. This Court may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States and seeks redress under federal law.

23. This Court possesses jurisdiction over this matter pursuant to the NSA, 42 U.S.C. § 300gg-111(a)(3)(E)(i)(II), and the FAA, 9 U.S.C. § 10.

24. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Petitioners and Respondents have sufficient contacts in this judicial district, and a substantial part of the events and/or omissions giving rise to this action occurred in this judicial district.

25. Venue is proper in the District of Connecticut pursuant to 29 U.S.C. §185(c) because Respondents are insurance organizations and/or administrators that maintain significant contacts in this judicial district, and Respondents' officers and agents engaged in insuring citizens in this judicial district.

## APPLICABLE LAW

**I.    The NSA's Independent Dispute Resolution Process**

26.    The NSA was enacted in 2022 to protect medical patients from liabilities resulting from surprise medical bills, or "balance billing." Previously, when health insurers declined to reimburse OON providers for services rendered to their members, even in certain emergency situations, patients were subject to "balance bills" to cover the difference between the OON providers' charges and the amount covered by the health insurers.

27.    Under the NSA, a patient's share of liability to an OON provider is limited to an amount comparable to what the patient would have owed to an in-network provider for the same services, holding the patient harmless. The NSA further sets out a framework for determining the proper OON rate.  42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D).

28.    Insurers may not always issue payment for all portions of a provider's bill. Sometimes, insurers may deny an entire bill or a portion of a bill on a Current Procedural Terminology ("CPT") code basis.  Under NSA regulations, "denials of payment" are eligible for the IDR process, whereas "adverse benefit determinations" are not eligible.

29.    A denial of payment issued by an insurer to an OON provider does not amount to an "adverse benefit determination" which must be disputed through a plan's/issuer's claims and appeals process, not through the Federal IDR process. *See* 86 FR at 36901-02.

30.    Accordingly, the NSA created the IDR, a process by which providers and insurers could (1) determine OON reimbursement rates in the absence of in-network contracts, and (2) resolve disputes concerning those rates. 42 U.S.C. § 300gg-111(c)(1)-(5).

31.    The IDR operates as follows:

1. First, the insurer, in response to the provider's initial claim for reimbursement, is required to issue an initial payment, known as a Qualifying payment amount ("QPA"). That amount is determined by the insurer and is meant to reflect the median in-network rate for the applicable service. 42 U.S.C. § 300gg-111(a)(3)(E).

2. Second, if the provider is dissatisfied with the QPA, the provider maintains the right to initiate a negotiation with the insurer. During this 30-day negotiation period, the provider and the insurer attempt to negotiate the price for the service. 42 U.S.C. § 300gg-111(c)(1)(A).

3. Third, if these negotiations fail, the provider and/or insurer have four (4) days to initiate the IDR process through the Portal. 42 U.S.C. § 300gg-111(c)(1)(B); Federal CIDRE Guidelines, § 3.2.

4. Fourth, a CIDRE is selected by either the parties or the Department of Health and Human Services ("HHS"). 42 U.S.C. § 300gg-111(c)(4).

5. Finally, the CIDRE determines whether the parties' dispute is eligible for IDR and then decides the amount owed to the provider by the insurer by selecting one of the parties' valuations for the qualified items or services. 42 U.S.C. § 300gg-111(c)(5).

32. When a provider elects to pursue the IDR process, a Notice of IDR Initiation is required and, along with it, "an attestation that the item(s) or service(s) under dispute is/are qualified." *See* Federal IDR Guidelines § 3.3.

33. After the process is initiated, the parties' selection of the CIDRE must contain, among several other items, "an attestation, regarding the applicability of the Federal IDR Process." *Id* at § 4.3.

34. Where the parties do not object to the CIDRE *or* the services' eligibility for the IDR process, the CIDRE proceeds to collect the necessary information to make its final payment determination "with respect to a determination for a **qualified** IDR item or service." 42 U.S.C. § 300gg-111(c)(5)(B) (emphasis added).

35. Within ten (10) days of the CIDRE's selection, the parties submit their payment offers and information relevant to the final payment determination. *Id.*

## II.  Arbitrability

36. The IDR process "may be used to determine the OON rate for '**qualified** IDR items or services,'" including "nonemergency items and services furnished by OON providers at certain in-network health care facilities," emergency services, or air ambulance services. *See* www.cms.gov, *Chart-Applicability-Federal-IDR-Process-1.* (emphasis added).

37. A CIDRE must determine whether a service or item is qualified for the IDR process as a prerequisite to commencing the final payment selection. 42 U.S.C. § 300gg-111(c)(5)(B).

38. Under the FAA, 9 U.S.C. §10(4), the threshold inquiry of eligibility or arbitrability "is quasi-jurisdictional," in order to make sure that the arbitration agreement in question, in this case the mandatory arbitration provisions of the NSA, "grant[] the arbitrator authority to reach the issues it resolved." *See Armont v. K12 (Fla. Cyber Charter Acad.—FLCCA)*, No. 3:19-cv-334-MMH-MCR, 2024 U.S. Dist. LEXIS 73397, at *9 (M.D. Fla. Apr. 23, 2024).

9

39. A violation of the terms of the NSA's IDR regulations and federal guidelines enacted pursuant to the NSA constitutes a sufficient basis to challenge an arbitration award under the FAA, 9 U.S.C. §10(4). *Wise v. Wachovia Sec., LLC*, 450 F.3d 265, 269 (7th Cir. 2006)).

### III. Review of IDR Arbitration Awards

40. The NSA provides that an arbitration decision rendered by a "certified IDR entity…shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim; and . . . shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of Title 9," which is part of the FAA. 42 U.S.C. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II).

41. Judicial review of an IDR award is limited to the following circumstances:

   1. where the award was procured by corruption, fraud, or undue means;
   2. where there was evident partiality or corruption in the arbitrators, or either of them;
   3. where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced: or
   4. where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4).

42. IDR awards may be challenged within ninety days of the arbitration decision. 9 U.S.C. §12. Here, the IDR awards were issued on or after November 13, 2024. Thus, the instant petition is timely.

## RELEVANT FACTS COMMON TO ALL PLAINTIFFS

43. Petitioners provided medical services to Respodents' members as OON providers for qualified IDR services, as described in **Exhibit A.**

44. Petitioners submitted claims for reimbursement of these services to Respondents, which were denied or significantly underpaid. Providers then initiated arbitration through ProPeer, which then selected Respondents as the prevailing parties, ruling that $0.00 best represented the **value of the qualified IDR item or service**, including some services where the insurance carriers had remitted pre-arbitration payment for the services at issue. *See* Sample determinations for each Respondent, attached hereto as **Exhibit B**.

45. In the hundreds of explanations for its determination of the Arbitration Awards, ProPeer repeatedly stated, in cookie cutter fashion, that, "[a]fter considering all permissible information submitted by both parties, ProPeer Resources, LLC has determined that the out-of-network payment amount of $0.00 offered by [the insurer] is the appropriate out-of-network rate for the item or service [] on this claim [] under this dispute.

46. According to the Federal IDR Guidelines, parties may submit "any additional information relating to the offer that does not include information on prohibited factors described in Section 6.3 and must do so no later than 10 business days after the finalization of the selection of the certified IDR entity." *See* Federal CIDRE Guidelines, § 5.1.

47. For nearly every Arbitration Award, the "determination factors" show an "x" marking each party's submission of supporting information. As shown below, Respondents ("Non-

Initiating Party" column) failed to address any of the enumerated categories of information *except* the ambiguous "additional information submitted by a party" category.

| | Additional Circumstances | Initiating Party | Non-Initiating Party |
|---|---|---|---|
| 1 | The level of training, experience, and quality and outcomes measurements of the provider or facility that furnished such item or service (such as those endorsed by the consensus-based entity authorized in section 1890 of the Social Security Act) | X | |
| 2 | The market share held by the nonparticipating provider or facility or that of the plan or issuer in the geographic region in which the item or service was provided | X | |
| 3 | The acuity of the individual receiving such item or service or the complexity of furnishing such item or service to such individual | X | |
| 4 | The teaching status, case mix, and scope of services of the nonparticipating facility that furnished such item or service | X | |
| 5 | Demonstrations of good faith efforts (or lack of good faith efforts) made by the disputing parties to enter into network agreements and, if applicable, contracted rates between the disputing parties during the previous 4 plan years | X | |
| 6 | Additional information submitted by a party | X | X |

48.      Upon information and belief, in nearly every arbitration at issue, ProPeer's cookie cutter Final Determination Rationale only stated the following:

> "Determination in favor of [the insurer] was made in this case. All submitted information was reviewed and investigated thoroughly. The initiating party provided evidence of the level of training and experience of the provider, market share, acuity of the participant, teaching status/case mix, good faith efforts to negotiate and additional information. There was sufficient information provided by the non-initiating party to support additional information. In addition, QPA was reviewed and considered in the determination. The information submitted by [the insurer] demonstrated the offer selected as the out-of-network rate is the offer that best represents the value of the qualified IDR item or service. The level of care provided was consistent with the initiating party's offer. Based on the preponderance of information, [the insurer] is the prevailing party."

See **Exhibit B**.

49.      For each Arbitration Award, ProPeer rendered decisions based upon improper execution of its arbitration powers under the NSA, resulting in vastly inconsistent determinations

12

of the value of the services provided. Through the boilerplate analysis provided, and nearly carbon copy decisions issued, it is evident that, rather than determining the value of the qualified services, ProPeer instead agreed with the Respondents' denials of coverage or the insurers' statements of ineligibility, disguised as $0.00 value determinations of the services.

50. Notably, prior to November 13, 2024, ProPeer routinely selected the provider as the prevailing party where the insurer presented a $0.00 final offer, which is the appropriate determination where a CIDRE disagrees with an insurers' $0.00 final offer accompanies by a statement of a case's ineligibility. An example of such instances is attached hereto as **Exhibit C**. In the example payment determination, the insurer offered varying supporting information, as seen in the "determination factors," unlike the Arbitrations here.

51. Each decision at issue states, "ProPeer Resources LLC has determined that the out-of-network payment amount of $0.00 offered by [the insurer] is the appropriate out-of-network rate…" *See,* e.g. **Exhibit B**. However, for a litany of reasons, it is clear that ProPeer's determinations were not based on the value of the services but rather on determinations as to whether the services should have been eligible for arbitration and/or whether the services were eligible for payment in the first place, as promulgated by Respondents.

52. Importantly, ProPeer has previously determined that $0.00 was not the prevailing value of certain CPT codes which are the same codes disputed in some of the subject Arbitrations, thereby selecting the provider as the prevailing party. For example, in DISP-1613746, CPT code 15777 was unpaid by the insurer, Aetna, on the basis of coverage. The denial was subject to NSA arbitration and ProPeer determined that the provider was the prevailing party even though Aetna submitted a $0.00 final offer. See **Exhibit D.**

53. Conversely, in one of the instant matters, in DISP-1649147, ProPeer analyzed the value of the same service under the same CPT code, which was denied for coverage by insurer, BCBS- Federal Employee Program. However, ProPeer rendered the opposite decision. In this example, consistent with several others, the insurer appeared to have submitted far less supporting documentation, relying only on "additional" information. See **Exhibit D**.

54. First, it defies all logic that ProPeer would value the services in question, on hundreds of occasions, at $0.00, as compared to Petitioners' final offers. This is evident by simply comparing ProPeer's results here to instances where the carrier's final offer was above $0.00.

55. Because a $0 valuation is, by definition, a less reasonable payment offer than a positive number (as it necessarily determines that medically necessary covered services are somehow completely without value), Petitioners' winning percentage in such cases would be expectedly higher. However, the opposite is true.

56. Since November 13, 2024, in instances where the insurers' final offers were positive numbers, ProPeer issued favorable decisions for providers at an 81% rate. Conversely, where the carrier's final offer was $0.00, ProPeer issued favorable decisions for providers at a 21.41% rate. This demonstrates that ProPeer's decisions in the $0.00 instances were not based on the reasonable value of the services, but rather based on ProPeer's determination that the services were not eligible for payment.

57. Moreover, out of 13 CIDREs, ProPeer is a complete outlier in issuing such $0.00 awards. Petitioners have received hundreds of awards from each CIDRE. While they have received hundreds of $0.00 decisions from ProPeer, no other CIDRE is issuing awards in this manner.

58. Finally, logic dictates that if ProPeer were truly taking the radical step of valuing medically necessarily covered services at $0.00, as compared to Petitioners' final offers, it would

explain as such in its determination rationale. However, out of the hundreds of Arbitration Awards, not one determination rationale contained an explanation as to why ProPeer was taking the unique step of choosing a $0.00 final offer, other than the boilerplate statement of, "ProPeer Resources LLC has determined that the out-of-network payment amount of $0.00 offered by [the insurer] is the appropriate out-of-network rate…"

59. Indeed, the language used in each of ProPeer's $0.00 award determinations is the exact same language used in its award determinations where the final offer was a positive number, defying all logic and common sense.

60. In addition, ProPeer's malfeasance in selecting Respondents' $0.00 final offers, made in connection with Respondents' coverage denials and/or statements of ineligibility, has escalated to a new category: Selection of Respondents' $0.00 final offers even when Respondents issued *some* prior payment, though well below the charged rate.

61. For example, in DISP-1270582 and DISP-1550351, Respondents initially paid, though well below the charged rate, for Petitioners' services, but subsequently submitted $0.00 valuation offers for the services for which they already paid. *See* **Exhibit E**. When the matters were submitted to ProPeer under the IDR process, ProPeer somehow agreed that $0.00 was the more appropriate value using only "additional" documentation submitted by Respondents.

62. Respondents cannot inexplicably claim that the value of the services in question was $0.00 if they previously determined the services had *some* value. To illustrate ProPeer's systematic implementation of this improper policy, of the total 6,101 cases arbitrated by ProPeer since November 13, 2024, 1,827 consisted of $0.00 award offers from insurers. Of those arbitrations, 78.59% resulted in a $0.00 final award determination, with ProPeer choosing Respondents as the prevailing parties. Though they prevailed, Respondents generally failed to

provide any of the named categories of documentation other than the "any other information" category. However, in arbitrations involving an award offer of more than $0.00 from insurers, providers prevailed in 81% of the disputes.

63. The IDR process does not contemplate substantive analysis of the value of the disputed services before they are deemed as "qualified" for the IDR process.

64. By adopting Respondents' $0.00 final offers, based on their denials of coverage and/or statement of eligibility for the disputed services, as opposed to a proposed valuation of those services, ProPeer failed to make the preliminary quasi-jurisdictional determination of arbitrability. By failing to produce a mutual, final, and definite award upon the subject matter submitted, ProPeer misused and exceeded its arbitration powers under the NSA.

65. ProPeer's misuse of the IDR process resulted in severe prejudice to Petitioners and their medical practices. Had ProPeer elected to dismiss the arbitrations for ineligibility based on denial of coverage, a decision not based on the merits or value of the services, Petitioners would have recouped or partially recouped the IDR fees paid to ProPeer, totaling $14,720.00, and pursued alternative means of relief.

66. Dismissal based upon NSA ineligibility triggers several alternative options for Petitioners. Importantly, Petitioners would be permitted to balance bill the patients, an avenue otherwise foreclosed by the NSA for "qualified" services. Petitioners (or the patients themselves) could also have appealed Respondents' coverage denials through the predetermined appeals processes afforded by the patients' healthcare plans.

67. However, ProPeer failed to engage in the analysis of whether dismissal was appropriate as opposed to rendering a decision on the merits in favor of a $0.00 final carrier offer. Instead, the ineligible claims were nonetheless subject to ProPeer's valuation the same way eligible

claims are evaluated. *If* ProPeer agreed with Respondents that the claims were ineligible for lack of coverage, dismissal would have been the proper resolution. Then, at the very least, Petitioners would have been entitled to $14,720.00 in reimbursed entity fees, in addition to the alternative remedies for seeking reimbursement.

68. In addition to these alternative remedies, Petitioners would also have had the opportunity to contest the dismissals, unlike determinations on the merits that require the herein petition for judicial intervention to vacate the arbitration awards.

69. As Petitioners were foreclosed from every possible alternative means of recovery through ProPeer's actions, ProPeer cornered the Petitioners into essentially performing free services to the benefit of the patients, Respondents, and ProPeer. ProPeer received compensation for adjudicating the disputes incorrectly and without authority to do so in the first place, if it viewed these disputes as ineligible under the NSA.

70. To this day, a determination as to the *value* of the qualified IDR services performed has not been made such that there has been "a mutual, final, and definite award upon the subject matter submitted." 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II); 9 U.S.C. § 10(a)(4).

71. Accordingly, the Arbitration Awards should be vacated and the matters remanded to the IDR arbitration proceedings so that ProPeer may first determine the eligibility for the IDR process and *then* choose the value of the qualified IDR services at issue. Where a service is determined to be ineligible for the NSA's IDR process, ProPeer must appropriately dismiss the arbitration, returning the entity fees paid by Petitioners, so that Petitioners may pursue their lawful, alternative means of recovery for the services provided.

**PRAYER FOR RELIEF**

ProPeer's conduct, as set forth above, was an overextension of power sufficient to vacate the arbitration award under 9 U.S.C. § 10(a)(4).

**WHEREFORE**, Petitioners demand judgment as follows:

a. Ordering that the Arbitration Awards be vacated in their totality;

b. Remanding the matters to the IDR process for eligibility determinations;

c. Awarding any other relief the Court deems just and equitable under the circumstances.

                                            **GOTTLIEB & GREENSPAN LLC**

                                            /s/ *James Greenspan*
                                            James Greenspan (Attorney ID:444244)
                                            17-17 Route 208, Suite 250
                                            Fair Lawn, New Jersey 07410
                                            Telephone: 201-644-0891
                                            eFax: 201-465-3033
                                            jgreenspan@gottliebandgreenspan.com
                                            *Attorneys for Petitioners*

Dated: February 11, 2025

**CERTIFICATION**

I hereby certify that the matter in controversy is not the subject of any other action, arbitration, or other administrative proceeding now filed or contemplated.

                                            **GOTTLIEB & GREENSPAN LLC**

                                              */s/ James Greenspan*
                                            James Greenspan

## APPENDIX A

**TABLE 1**

| Provider Name | Principal Place of Business |
|---|---|
| Plastic and Reconstructive Surgery Group | 2 Greenwich Office Park Suite 210, Greenwich, Connecticut, 06831 |
| Richard Agag, MD | 456 Washington Street, 8E, New York, New York 10021 |
| Shareef Jandali Plastic Surgery LLC | 5520 Park Avenue, Suite WP-2-300, Trumbull, Connecticut 06611 |
| The DIEP Group CT PLLC | 21 Southport Terrace, Southport, Connecticut, 06890 |

**TABLE 2**

| Insurer Name | Principal Place of Business |
|---|---|
| Aetna, Inc. | 151 Farmington Avenue, Hartford, Connecticut 06156 |
| Anthem, Inc. | 220 Virginia Avenue, Indianapolis, Indiana 46204 |
| Blue Cross Blue Shield Federal Employee Program | 750 9th Street NW, Washington, DC 20001 |
| Cigna Health and Life Insurance Company | 900 Cottage Grove Road, Bloomfield, Connecticut 06002 |
| ConnectiCare, Inc. | 175 Scott Swamp Road Building 2, Farmington, Connecticut 06032 |
| UnitedHealthcare | 4 Research Drive, Shelton, Connecticut 06484 |